IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NATIONAL WILDLIFE FEDERATION, IDAHO
WILDLIFE FEDERATION, WASHINGTON
WILDLIFE FEDERATION, SIERRA CLUB,
TROUT UNLIMITED, PACIFIC COAST
FEDERATION OF FISHERMEN'S
ASSOCIATIONS, INSTITUTE FOR
FISHERIES RESOURCES, IDAHO RIVERS
UNITED, IDAHO STEELHEAD AND SALMON
UNITED, NORTHWEST SPORTFISHING
INDUSTRY ASSOCIATION,  SALMON FOR ALL,
COLUMBIA RIVERKEEPER, AMERICAN RIVERS,
INC., FEDERATION OF FLY FISHERS, and NW
ENERGY COALITION,

CV 01-640-RE (Lead Case)
CV 05-23-RE
(Consolidated Cases)

OPINION AND ORDER

        Plaintiffs,

  and

STATE OF OREGON,

        Intervenor-Plaintiff,

    vs.

NATIONAL MARINE FISHERIES SERVICE,
U.S. ARMY CORPS OF ENGINEERS, and
U.S. BUREAU OF RECLAMATION,

        Defendants,

and

STATE OF IDAHO, NORTHWEST IRRIGATION
UTILITIES, PUBLIC POWER COUNCIL,
WASHINGTON STATE FARM BUREAU
FEDERATION, FRANKLIN COUNTY FARM
BUREAU FEDERATION, GRANT COUNTY FARM
BUREAU FEDERATION, NORTHWEST
REQUIREMENT UTILITIES, PACIFIC
NORTHWEST GENERATING COOPERATIVES,
INDUSTRIAL CUSTOMERS OF NORTHWEST
UTILITIES, ALCOA, INC., and INTERNATIONAL
ASSOCIATION OF MACHINISTS & AEROSPACE
WORKERS,

                Intervenor-Defendants.
_____

COLUMBIA SNAKE RIVER IRRIGATORS
ASSOCIATION and EASTERN OREGON
IRRIGATORS ASSOCIATION

                Plaintiffs,

      vs.

CARLOS M. GUTIERREZ, in his official capacity
as Secretary of Commerce, NOAA
FISHERIES, and D. ROBERT LOHN,
in his official capacity as Regional Director
of NOAA Fisheries,

                Defendants.

REDDEN, Judge:

      The matter before the court in this consolidated case is plaintiffs' (collectively

"NWF") motion for a preliminary injunction or, in the alternative, for a permanent

injunction (doc. 834 in lead case CV 01-640-RE). The background of this consolidated

case, including the parties, the issues involved, the claims made, and the

prior rulings, is more fully set forth in my opinion and order issued on May 26, 2005.

Oral argument was held on June 10, 2005.  For the following reasons, I **GRANT in part and DENY in part** NWF's motion.

## Background

This case relates to biological opinions issued by defendant NOAA (formerly "National Marine Fisheries Service") to the defendant action agencies (U.S. Army Corps of  Engineers ("the Corps") and the U.S. Bureau of Reclamation ("BOR")) in December, 2000 (2000BiOp) and November, 2004 (2004BiOp).  The biological opinions addressed the impact of continuing operations of dams and water projects in the Federal Columbia River Power System (DAMS) on listed species.

On May 26, 2005, I granted the motions for summary judgment filed by NWF and the State of Oregon invalidating the 2004BiOp as arbitrary and capricious and contrary to the provisions of the Endangered Species Act (ESA).  My decision was based on a number of grounds, including that the action agencies and NOAA failed to consult on the entirety of the proposed action.  NOAA unlawfully restricted the basis of its jeopardy analysis and adverse modification of habitat determination to an estimate of the impacts they deemed derived from so-called "discretionary" aspects of the proposed action. This analysis constituted a substantial procedural violation of NOAA's consultation duty pursuant to section 7 of the ESA.

## NWF's Motion for Injunction

NWF has two principle claims for an injunction against the Corps and BOR: (1) that the agencies failed to comply with the procedural and substantive requirements under section 7(a)(2) of the ESA, and (2) that they will likely violate the ESA's

prohibition against unlawful take pursuant to section 9. Because, as indicated below, I find NWF is entitled to injunction relief on the first basis, I decline to address the other basis.

In its motion for an injunction, NWF seeks:

1.    An order requiring NOAA to withdraw the 2004 BiOp.

2.    An order requiring the action agencies to comply with and implement all of the reasonable and prudent alternative (RPA) mitigation actions described in the 2000BiOp, with the exception of certain specific 2005 summer flow and spill measures NWF seeks to have implemented.

3.    As to 2005 summer flow, an order requiring the action agencies to:

(a)    Decrease by at least 10 percent the water particle travel time (WPTT) in the Snake River from the head of Lower Granite reservoir to Ice Harbor Dam between June 20, 2005 and August 31, 2005, with the decrease distributed evenly during this period, over what the WPTT would be under the proposed action, the 2004BiOp, and the agencies' estimate of average Snake River flows in July and August this summer of approximately 27,750 cubic feet per second (cfs) (which includes an estimated 300,000 acre feet of total flow augmentation water from the Upper Snake River and 237,000 acre feet of water from Brownlee), through an appropriate combination of reservoir drawdown, additional flow augmentation, and other measures that would provide the most favorable migration conditions for listed species; and

(b)    Decrease by at least 10 percent the WPTT in the Columbia River from its confluence with the Snake River to Bonneville Dam between July 1, 2005 and August 31, 2005, with the decrease distributed evenly during this period, over what the WPTT would be under the proposed action, 2004BiOp, and the agencies' estimate of average Columbia River flows in July and August this summer of approximately 137,250 cfs, through an appropriate combination of reservoir drawdown, additional flow augmentation, and other measures that would provide the most favorable migration conditions for listed species.

4.    As to 2005 summer spill, an order requiring the action agencies to:

(a)    Provide spill from June 20, 2005, through August 31, 2005, of all water in excess of that required for station service, on a 24-hour basis, at the

Lower Granite, Little Goose, Lower Monumental, and Ice Harbor Dams on the lower Snake River; and

(b)     Provide spill from July 1, 2005, through August 31, 2005, of all flows above 50,000 cfs, on a 24-hour basis, at the McNary Dam on the Columbia River.

5.      An order requiring the Corps, BOR, and NOAA to file with the court a joint report on spill and flow requirements within 10 days of the entry of an injunction, setting forth the operational measures they will employ to comply with the terms of the injunction and, thereafter, to file reports every two weeks, beginning two weeks after June 20, 2005, until two weeks after August 31, 2005, demonstrating compliance with these terms.

## Injunction Standards

When federal statutes are violated, a party is entitled to an injunction when one is "necessary to effectuate the congressional purpose behind the statute." *Biodiversity Legal Foundation v. Badgley*, 284 F.3d 1046, 1057 (9th Cir. 2002).

Under the ESA, once a plaintiff has succeeded on the merits, injunctive relief depends on a balance of the harm to the listed species and the public interest. *National Wildlife Fed. v. NMFS*, 235 F.Supp.2d 1143, 1161 (W.D. Wa. 2002).   A plaintiff is required to show only a "possibility" of irreparable harm to the listed species to obtain an injunction under the ESA. *Earth Island Inst. v. U.S. Forest Service*, 351 F.3d 1291, 1298 (9th Cir. 2003).

## Discussion

**A.     Injunction Against NOAA**.

In my May 2005 opinion, I found the 2004BiOp does not comply with the ESA's mandate to protect listed species.  I deny NWF's motion to require NOAA to withdraw the 2004BiOp.  Rather, I set a status conference for 9:00 a.m. on September 7, 2005, to

discuss the remand, the possible withdrawal of the 2004BiOp, and what, if anything, shall remain in place during the remand.  In the interim, I encourage the parties to attempt to reach a consensus on these issues, as well as issues relating to the timeframe for the remand and the instructions and reporting requirements that will guide the remand.  The parties shall advise me if a consensus is reached.

**B.    Injunction Against Action Agencies.**

   **1.    Violation of the ESA.**

   In my May 2005 opinion, I found the 2004BiOp violates the ESA.  I now conclude that, in light of their reliance on the 2004BiOp, the Record of Consultation and Statement of Decision (ROD) issued by the Corps on January 3, 2005, and the ROD issued by the BOR on January 12, 2005, also violate the ESA.

   Federal defendants maintain that the RODs go beyond mere reliance on the BiOp to offer an independent rational account for the agencies' decisions.  I disagree. The RODs provide no specific analysis nor point to any record evidence to support the assertion that the action agencies conducted independent assessments and reached independent and rational conclusions in adopting them.  The RODS reveal that these agencies embraced the same fundamental legal flaws that NOAA attempted to use to justify its  circumscription of the action subjected to jeopardy analysis.  I find, therefore, that in substance the RODs relied on the no-jeopardy finding of the 2004BiOp without an independent rational basis for doing so.

   Federal defendants, citing *Pyramid Lake Paiute Tribe v. U.S. Dept. of Navy*, 989 F.2d 1410, 1415 (9th Cir. 1990), maintain that the Corps and BOR were entitled to rely

on the 2004BiOp, even if invalid, unless the agencies had "new information" that was not before NOAA when it issued the 2004BiOp. I disagree. While "new information" forms one basis for finding that an action agency may not rely on a no-jeopardy finding in a biological opinion, this is not the only basis. *Pyramid Lake* notes a second consideration, finding that "the record contain[ed] no other data which undermine[d] seriously the FWS's opinions." *Id.* at 1416. This court has previously found that an action agency cannot rely on a "facially arbitrary no-jeopardy determination" where extensive record evidence indicates an action will harm threatened species. *Northwest Environmental Advocates v. EPA*, 268 F.Supp.2d 1255, 1274 (D. Or. 2003).

I find that there was substantial "other data" reported in the 2004BiOp itself, including the level of morality attributable to so-called nondiscretionary elements of the proposed action. That consideration of the data, however, was consigned to the "environmental baseline" and thereby not utilized to form the basis of the required jeopardy analysis and adverse modification determinations. The action agencies knew of this other data, and of its marginalization by NOAA, and yet adopted NOAA's no-jeopardy determination. I find, therefore, that the agencies have failed in their continuing independent duties to ensure that their actions will avoid jeopardy. The action agencies were not entitled to base their determination as to the impact of their proposed action on any analysis that excludes full consideration of all its elements.

I conclude that the determinations by the Corps and BOR that the proposed action will not likely jeopardize listed species are arbitrary and capricious and violate the ESA.

## 2.    <u>Harm to Listed Species.</u>

In my May 2005 opinion, I ruled that adverse impacts to listed species cannot be insulated from the basis of NOAA's jeopardy analysis simply because they are deemed to be attributable to the existence and non-discretionary operations of the dams.  As currently operated, I find that the DAMS strongly contribute to the endangerment of the listed species and irreparable injury will result if changes are not made.

As noted above, the 2004 BiOp is substantially procedurally flawed because it failed to conduct a jeopardy analysis on the basis of all elements of the proposed action, including so-called nondiscretionary aspects of the operation of the DAMS.  Where "a project is allowed to proceed without substantial compliance" with the procedural requirements of the ESA, "there can be no assurance that a violation of the ESA's substantive provisions will not result."  *Thomas v Peterson*, 753 F.2d 754, 764 (9th Cir.1985).

Ample evidence in the record, some of which was cited by NWF (Pl. Reply Memo. at 36-37), indicates that operation of the DAMS causes a substantial level of mortality to migrating juvenile salmon and steelhead.  Indeed, in the 2004BiOp itself, NOAA noted that while "a non-trivial level of mortality would likely occur even under free-flowing river conditions . . ., the existence and operations of the dams and reservoirs . . . account[s] for most of the mortality of juvenile migration through the FCRPS . . . ."  2004BiOp at 5-29.

As a hedge against a portion of the mortality attributable to DAM operations, the RPA for the 2000 BiOp targeted spill during summer months at a level minimally

necessary to allow for a meaningful in-river migration program against which the summer transportation program would be compared. However, the proposed action analyzed in the 2004BiOp allows for no voluntary spill at four lower Snake River and Columbia Dams (Lower Granite, Little Goose, Lower Monumental, and McNary) during the summer transport period. This restriction would not preserve even a semblance of the spread-the-risk considerations NOAA contends govern the spring migration program. It would not allow a meaningful evaluation of the summer transportation program.

I find that irreparable harm results to listed species as a result of the action agencies' implementation of the updated proposed action. The law is clear that an injunction to protect listed species from harm is necessary regardless of economic costs. *National Wildlife Fed. v. NMFS*, 235 F.Supp.2d at 1161; *Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir. 1987). I have found that NOAA's attempt to insulate the lion's share of impacts attributable to ongoing operation of the DAMS from jeopardy scrutiny is invalid. I also find that if the action agencies carry out the proposed action, they will not have met their key substantive obligation under the ESA to "insure that any action" they carry out "is not likely to jeopardize" or adversely affect the critical habitat of listed species, 16 USC § 1536(a)(2). This is because the proposed action is not supported by an adequate consultation and a no-jeopardy determination.

Although I intend to order the action agencies to withdraw their RODs implementing the proposed action, I reserve my final order until after the September 7th status conference on the remand issues.

3.     **Implementation of 2000 RPA.**

I reserve my final order on this issue until after the September 7th status conference on the remand issues.

4.     **2005 Summer Operations.**

(a)     **Increased Rates of Flow**.

Although NWF has strongly argued that a change in WPTT is necessary to avoid irreparable harm to juvenile fall chinook this summer, I am convinced that accomplishment of this goal requires further study and consultation. I deny NWF's request as to the 2005 summer flow, subject to the requirement that during the remand, the parties and their representatives shall engage in a collaboration to resolve the issues raised by flow. I will issue specific instructions with respect to the flow collaboration.

(b)     **Spill.**

I grant NWF's motion with respect to 2005 summer spill. This injunction is necessary to avoid irreparable harm to juvenile fall chinook and other listed species. The action agencies shall:

(1)   Provide spill from June 20, 2005, through August 31, 2005, of all water in excess of that required for station service, on a 24-hour basis, at the Lower Granite, Little Goose, Lower Monumental, and Ice Harbor Dams on the lower Snake River; and

(2)   Provide spill from July 1, 2005, through August 31, 2005, of all flows above 50,000 cfs, on a 24-hour basis, at the McNary Dam on the Columbia River.

I encourage the parties to engage in discussions to reach a consensus on issues of spill, and to advise me if one is reached during the period covered by my 2005 summer spill order.  Otherwise, the spill shall proceed in accordance with this order.

## <u>CONCLUSION</u>

In accordance with the foregoing discussion, the court **GRANTS in part and DENIES in part**  NWF's motion for a preliminary injunction or, in the alternative, for a permanent injunction (doc. 834).  I reserve decision on whether NWF must post an injunction bond until after further briefing by the parties.

IT IS SO ORDERED.

DATED this 10th day of June, 2005.


 /S/ James A. Redden_____
James A. Redden
 United States District Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NATIONAL WILDLIFE FEDERATION, IDAHO
WILDLIFE FEDERATION, WASHINGTON
WILDLIFE FEDERATION, SIERRA CLUB,
TROUT UNLIMITED, PACIFIC COAST
FEDERATION OF FISHERMEN'S
ASSOCIATIONS, INSTITUTE FOR
FISHERIES RESOURCES, IDAHO RIVERS
UNITED, IDAHO STEELHEAD AND SALMON
UNITED, NORTHWEST SPORTFISHING
INDUSTRY ASSOCIATION,  SALMON FOR ALL,
COLUMBIA RIVERKEEPER, AMERICAN RIVERS,
INC., FEDERATION OF FLY FISHERS, and NW
ENERGY COALITION,

            Plaintiffs,

    and

STATE OF OREGON,

            Intervenor-Plaintiff,

      vs.

NATIONAL MARINE FISHERIES SERVICE,
U.S. ARMY CORPS OF ENGINEERS, and
U.S. BUREAU OF RECLAMATION,

            Defendants,

CV 01-640-RE (Lead Case)
CV 05-23-RE
(Consolidated Cases)

OPINION AND ORDER

and

STATE OF IDAHO, NORTHWEST IRRIGATION
UTILITIES, PUBLIC POWER COUNCIL,
WASHINGTON STATE FARM BUREAU
FEDERATION, FRANKLIN COUNTY FARM
BUREAU FEDERATION, GRANT COUNTY FARM
BUREAU FEDERATION, NORTHWEST
REQUIREMENT UTILITIES, PACIFIC
NORTHWEST GENERATING COOPERATIVES,
INDUSTRIAL CUSTOMERS OF NORTHWEST
UTILITIES, ALCOA, INC.,  and INTERNATIONAL
ASSOCIATION OF MACHINISTS & AEROSPACE
WORKERS,

                         Intervenor-Defendants.
_____

COLUMBIA SNAKE RIVER IRRIGATORS
ASSOCIATION and EASTERN OREGON
IRRIGATORS ASSOCIATION

                         Plaintiffs,

         vs.

CARLOS M. GUTIERREZ, in his official capacity
as Secretary of Commerce, NOAA
FISHERIES, and D. ROBERT LOHN,
in his official capacity as Regional Director
of NOAA Fisheries,

                         Defendants.

REDDEN, Judge:

        The matter before the court in this consolidated case is plaintiffs' (collectively

"NWF") motion for a preliminary injunction or, in the alternative, for a permanent

injunction (doc. 834 in lead case CV 01-640-RE).  The background of this consolidated

case, including the parties, the issues involved, the claims made, and the

prior rulings, is more fully set forth in my opinion and order issued on May 26, 2005.

Oral argument was held on June 10, 2005. For the following reasons, I **GRANT in part and DENY in part** NWF's motion.

<u>**Background**</u>

This case relates to biological opinions issued by defendant NOAA (formerly "National Marine Fisheries Service") to the defendant action agencies (U.S. Army Corps of Engineers ("the Corps") and the U.S. Bureau of Reclamation ("BOR")) in December, 2000 (2000BiOp) and November, 2004 (2004BiOp). The biological opinions addressed the impact of continuing operations of dams and water projects in the Federal Columbia River Power System (DAMS) on listed species.

On May 26, 2005, I granted the motions for summary judgment filed by NWF and the State of Oregon invalidating the 2004BiOp as arbitrary and capricious and contrary to the provisions of the Endangered Species Act (ESA). My decision was based on a number of grounds, including that the action agencies and NOAA failed to consult on the entirety of the proposed action. NOAA unlawfully restricted the basis of its jeopardy analysis and adverse modification of habitat determination to an estimate of the impacts they deemed derived from so-called "discretionary" aspects of the proposed action. This analysis constituted a substantial procedural violation of NOAA's consultation duty pursuant to section 7 of the ESA.

<u>**NWF's Motion for Injunction**</u>

NWF has two principle claims for an injunction against the Corps and BOR: (1) that the agencies failed to comply with the procedural and substantive requirements under section 7(a)(2) of the ESA, and (2) that they will likely violate the ESA's

prohibition against unlawful take pursuant to section 9.  Because, as indicated below, I

find NWF is entitled to injunction relief on the first basis, I decline to address the other

basis.

In its motion for an injunction, NWF seeks:

1.      An order requiring NOAA to withdraw the 2004 BiOp.

2.      An order requiring the action agencies to comply with and
        implement all of the reasonable and prudent alternative (RPA)
        mitigation actions described in the 2000BiOp, with the exception of
        certain specific 2005 summer flow and spill measures NWF seeks
        to have implemented.

3.      As to 2005 summer flow, an order requiring the action agencies to:

(a)     Decrease by at least 10 percent the water particle travel time (WPTT) in
        the Snake River from the head of Lower Granite reservoir to Ice Harbor
        Dam between June 20, 2005 and August 31, 2005, with the decrease
        distributed evenly during this period, over what the WPTT would be under
        the proposed action, the 2004BiOp, and the agencies' estimate of average
        Snake River flows in July and August this summer of approximately
        27,750 cubic feet per second (cfs) (which includes an estimated 300,000
        acre feet of total flow augmentation water from the Upper Snake River and
        237,000 acre feet of water from Brownlee), through an appropriate
        combination of reservoir drawdown, additional flow augmentation, and
        other measures that would provide the most favorable migration
        conditions for listed species; and

(b)     Decrease by at least 10 percent the WPTT in the Columbia River from its
        confluence with the Snake River to Bonneville Dam between July 1, 2005
        and August 31, 2005, with the decrease distributed evenly during this
        period, over what the WPTT would be under the proposed action,
        2004BiOp, and the agencies' estimate of average Columbia River flows in
        July and August this summer of approximately 137,250 cfs, through an
        appropriate combination of reservoir drawdown, additional flow
        augmentation, and other measures that would provide the most favorable
        migration conditions for listed species.

4.      As to 2005 summer spill, an order requiring the action agencies to:

(a)     Provide spill from June 20, 2005, through August 31, 2005, of all water in
        excess of that required for station service, on a 24-hour basis, at the

Lower Granite, Little Goose, Lower Monumental, and Ice Harbor Dams on the lower Snake River; and

(b)     Provide spill from July 1, 2005, through August 31, 2005, of all flows above 50,000 cfs, on a 24-hour basis, at the McNary Dam on the Columbia River.

5.      An order requiring the Corps, BOR, and NOAA to file with the court a joint report on spill and flow requirements within 10 days of the entry of an injunction, setting forth the operational measures they will employ to comply with the terms of the injunction and, thereafter, to file reports every two weeks, beginning two weeks after June 20, 2005, until two weeks after August 31, 2005, demonstrating compliance with these terms.

## Injunction Standards

When federal statutes are violated, a party is entitled to an injunction when one is "necessary to effectuate the congressional purpose behind the statute." *Biodiversity Legal Foundation v. Badgley*, 284 F.3d 1046, 1057 (9th Cir. 2002).

Under the ESA, once a plaintiff has succeeded on the merits, injunctive relief depends on a balance of the harm to the listed species and the public interest. *National Wildlife Fed. v. NMFS*, 235 F.Supp.2d 1143, 1161 (W.D. Wa. 2002). A plaintiff is required to show only a "possibility" of irreparable harm to the listed species to obtain an injunction under the ESA. *Earth Island Inst. v. U.S. Forest Service*, 351 F.3d 1291, 1298 (9th Cir. 2003).

## Discussion

A.      **Injunction Against NOAA**.

In my May 2005 opinion, I found the 2004BiOp does not comply with the ESA's mandate to protect listed species. I deny NWF's motion to require NOAA to withdraw the 2004BiOp. Rather, I set a status conference for 9:00 a.m. on September 7, 2005, to

discuss the remand, the possible withdrawal of the 2004BiOp, and what, if anything, shall remain in place during the remand.  In the interim, I encourage the parties to attempt to reach a consensus on these issues, as well as issues relating to the timeframe for the remand and the instructions and reporting requirements that will guide the remand.  The parties shall advise me if a consensus is reached.

**B.    Injunction Against Action Agencies.**

      **1.    Violation of the ESA.**

In my May 2005 opinion, I found the 2004BiOp violates the ESA.  I now conclude that, in light of their reliance on the 2004BiOp, the Record of Consultation and Statement of Decision (ROD) issued by the Corps on January 3, 2005, and the ROD issued by the BOR on January 12, 2005, also violate the ESA.

Federal defendants maintain that the RODs go beyond mere reliance on the BiOp to offer an independent rational account for the agencies' decisions.  I disagree. The RODs provide no specific analysis nor point to any record evidence to support the assertion that the action agencies conducted independent assessments and reached independent and rational conclusions in adopting them.  The RODS reveal that these agencies embraced the same fundamental legal flaws that NOAA attempted to use to justify its  circumscription of the action subjected to jeopardy analysis.  I find, therefore, that in substance the RODs relied on the no-jeopardy finding of the 2004BiOp without an independent rational basis for doing so.

Federal defendants, citing *Pyramid Lake Paiute Tribe v. U.S. Dept. of Navy*, 989 F.2d 1410, 1415 (9th Cir. 1990), maintain that the Corps and BOR were entitled to rely

on the 2004BiOp, even if invalid, unless the agencies had "new information" that was not before NOAA when it issued the 2004BiOp. I disagree. While "new information" forms one basis for finding that an action agency may not rely on a no-jeopardy finding in a biological opinion, this is not the only basis. *Pyramid Lake* notes a second consideration, finding that "the record contain[ed] no other data which undermine[d] seriously the FWS's opinions." *Id.* at 1416. This court has previously found that an action agency cannot rely on a "facially arbitrary no-jeopardy determination" where extensive record evidence indicates an action will harm threatened species. *Northwest Environmental Advocates v. EPA*, 268 F.Supp.2d 1255, 1274 (D. Or. 2003).

I find that there was substantial "other data" reported in the 2004BiOp itself, including the level of morality attributable to so-called nondiscretionary elements of the proposed action. That consideration of the data, however, was consigned to the "environmental baseline" and thereby not utilized to form the basis of the required jeopardy analysis and adverse modification determinations. The action agencies knew of this other data, and of its marginalization by NOAA, and yet adopted NOAA's no-jeopardy determination. I find, therefore, that the agencies have failed in their continuing independent duties to ensure that their actions will avoid jeopardy. The action agencies were not entitled to base their determination as to the impact of their proposed action on any analysis that excludes full consideration of all its elements.

I conclude that the determinations by the Corps and BOR that the proposed action will not likely jeopardize listed species are arbitrary and capricious and violate the ESA.

2.     **Harm to Listed Species.**

In my May 2005 opinion, I ruled that adverse impacts to listed species cannot be insulated from the basis of NOAA's jeopardy analysis simply because they are deemed to be attributable to the existence and non-discretionary operations of the dams.  As currently operated, I find that the DAMS strongly contribute to the endangerment of the listed species and irreparable injury will result if changes are not made.

As noted above, the 2004 BiOp is substantially procedurally flawed because it failed to conduct a jeopardy analysis on the basis of all elements of the proposed action, including so-called nondiscretionary aspects of the operation of the DAMS.  Where "a project is allowed to proceed without substantial compliance" with the procedural requirements of the ESA, "there can be no assurance that a violation of the ESA's substantive provisions will not result."  *Thomas v Peterson*, 753 F.2d 754, 764 (9th Cir.1985).

Ample evidence in the record, some of which was cited by NWF (Pl. Reply Memo. at 36-37), indicates that operation of the DAMS causes a substantial level of mortality to migrating juvenile salmon and steelhead.  Indeed, in the 2004BiOp itself, NOAA noted that while "a non-trivial level of mortality would likely occur even under free-flowing river conditions . . ., the existence and operations of the dams and reservoirs . . . account[s] for most of the mortality of juvenile migration through the FCRPS . . . ."  2004BiOp at 5-29.

As a hedge against a portion of the mortality attributable to DAM operations, the RPA for the 2000 BiOp targeted spill during summer months at a level minimally

necessary to allow for a meaningful in-river migration program against which the summer transportation program would be compared. However, the proposed action analyzed in the 2004BiOp allows for no voluntary spill at four lower Snake River and Columbia Dams (Lower Granite, Little Goose, Lower Monumental, and McNary) during the summer transport period. This restriction would not preserve even a semblance of the spread-the-risk considerations NOAA contends govern the spring migration program. It would not allow a meaningful evaluation of the summer transportation program.

I find that irreparable harm results to listed species as a result of the action agencies' implementation of the updated proposed action. The law is clear that an injunction to protect listed species from harm is necessary regardless of economic costs. *National Wildlife Fed. v. NMFS*, 235 F.Supp.2d at 1161; *Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir. 1987). I have found that NOAA's attempt to insulate the lion's share of impacts attributable to ongoing operation of the DAMS from jeopardy scrutiny is invalid. I also find that if the action agencies carry out the proposed action, they will not have met their key substantive obligation under the ESA to "insure that any action" they carry out "is not likely to jeopardize" or adversely affect the critical habitat of listed species, 16 USC § 1536(a)(2). This is because the proposed action is not supported by an adequate consultation and a no-jeopardy determination.

Although I intend to order the action agencies to withdraw their RODs implementing the proposed action, I reserve my final order until after the September 7th status conference on the remand issues.

3. **Implementation of 2000 RPA.**

I reserve my final order on this issue until after the September 7th status conference on the remand issues.

4. **2005 Summer Operations.**

(a) **Increased Rates of Flow**.

Although NWF has strongly argued that a change in WPTT is necessary to avoid irreparable harm to juvenile fall chinook this summer, I am convinced that accomplishment of this goal requires further study and consultation. I deny NWF's request as to the 2005 summer flow, subject to the requirement that during the remand, the parties and their representatives shall engage in a collaboration to resolve the issues raised by flow. I will issue specific instructions with respect to the flow collaboration.

(b) **Spill.**

I grant NWF's motion with respect to 2005 summer spill. This injunction is necessary to avoid irreparable harm to juvenile fall chinook and other listed species. The action agencies shall:

(1) Provide spill from June 20, 2005, through August 31, 2005, of all water in excess of that required for station service, on a 24-hour basis, at the Lower Granite, Little Goose, Lower Monumental, and Ice Harbor Dams on the lower Snake River; and

(2)   Provide spill from July 1, 2005, through August 31, 2005, of all flows

above 50,000 cfs, on a 24-hour basis, at the McNary Dam on the Columbia

River.

I encourage the parties to engage in discussions to reach a consensus on issues

of spill, and to advise me if one is reached during the period covered by my 2005

summer spill order.  Otherwise, the spill shall proceed in accordance with this order.

## CONCLUSION

In accordance with the foregoing discussion, the court **GRANTS in part and**

**DENIES in part**  NWF's motion for a preliminary injunction or, in the alternative, for a

permanent injunction (doc. 834).  I reserve decision on whether NWF must post an

injunction bond until after further briefing by the parties.

IT IS SO ORDERED.

DATED this 10th day of June, 2005.


 /S/ James A. Redden_____
James A. Redden
 United States District Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NATIONAL WILDLIFE FEDERATION, IDAHO
WILDLIFE FEDERATION, WASHINGTON
WILDLIFE FEDERATION, SIERRA CLUB,
TROUT UNLIMITED, PACIFIC COAST
FEDERATION OF FISHERMEN'S
ASSOCIATIONS, INSTITUTE FOR
FISHERIES RESOURCES, IDAHO RIVERS
UNITED, IDAHO STEELHEAD AND SALMON
UNITED, NORTHWEST SPORTFISHING
INDUSTRY ASSOCIATION,  SALMON FOR ALL,
COLUMBIA RIVERKEEPER, AMERICAN RIVERS,
INC., FEDERATION OF FLY FISHERS, and NW
ENERGY COALITION,

CV 01-640-RE (Lead Case)
CV 05-23-RE
(Consolidated Cases)

OPINION AND ORDER

                Plaintiffs,

   and

STATE OF OREGON,

                Intervenor-Plaintiff,

       vs.

NATIONAL MARINE FISHERIES SERVICE,
U.S. ARMY CORPS OF ENGINEERS, and
U.S. BUREAU OF RECLAMATION,

                Defendants,

and

STATE OF IDAHO, NORTHWEST IRRIGATION
UTILITIES, PUBLIC POWER COUNCIL,
WASHINGTON STATE FARM BUREAU
FEDERATION, FRANKLIN COUNTY FARM
BUREAU FEDERATION, GRANT COUNTY FARM
BUREAU FEDERATION, NORTHWEST
REQUIREMENT UTILITIES, PACIFIC
NORTHWEST GENERATING COOPERATIVES,
INDUSTRIAL CUSTOMERS OF NORTHWEST
UTILITIES, ALCOA, INC.,  and INTERNATIONAL
ASSOCIATION OF MACHINISTS & AEROSPACE
WORKERS,

                    Intervenor-Defendants.
_____

COLUMBIA SNAKE RIVER IRRIGATORS
ASSOCIATION and EASTERN OREGON
IRRIGATORS ASSOCIATION

                    Plaintiffs,

      vs.

CARLOS M. GUTIERREZ, in his official capacity
as Secretary of Commerce, NOAA
FISHERIES, and D. ROBERT LOHN,
in his official capacity as Regional Director
of NOAA Fisheries,

                    Defendants.

REDDEN, Judge:

      The matter before the court in this consolidated case is plaintiffs' (collectively

"NWF") motion for a preliminary injunction or, in the alternative, for a permanent

injunction (doc. 834 in lead case CV 01-640-RE).  The background of this consolidated

case, including the parties, the issues involved, the claims made, and the

prior rulings, is more fully set forth in my opinion and order issued on May 26, 2005.

Oral argument was held on June 10, 2005. For the following reasons, I **GRANT in part and DENY in part** NWF's motion.

<u>**Background**</u>

This case relates to biological opinions issued by defendant NOAA (formerly "National Marine Fisheries Service") to the defendant action agencies (U.S. Army Corps of Engineers ("the Corps") and the U.S. Bureau of Reclamation ("BOR")) in December, 2000 (2000BiOp) and November, 2004 (2004BiOp). The biological opinions addressed the impact of continuing operations of dams and water projects in the Federal Columbia River Power System (DAMS) on listed species.

On May 26, 2005, I granted the motions for summary judgment filed by NWF and the State of Oregon invalidating the 2004BiOp as arbitrary and capricious and contrary to the provisions of the Endangered Species Act (ESA). My decision was based on a number of grounds, including that the action agencies and NOAA failed to consult on the entirety of the proposed action. NOAA unlawfully restricted the basis of its jeopardy analysis and adverse modification of habitat determination to an estimate of the impacts they deemed derived from so-called "discretionary" aspects of the proposed action. This analysis constituted a substantial procedural violation of NOAA's consultation duty pursuant to section 7 of the ESA.

<u>**NWF's Motion for Injunction**</u>

NWF has two principle claims for an injunction against the Corps and BOR: (1) that the agencies failed to comply with the procedural and substantive requirements under section 7(a)(2) of the ESA, and (2) that they will likely violate the ESA's

prohibition against unlawful take pursuant to section 9.  Because, as indicated below, I

find NWF is entitled to injunction relief on the first basis, I decline to address the other

basis.

In its motion for an injunction, NWF seeks:

1.      An order requiring NOAA to withdraw the 2004 BiOp.

2.      An order requiring the action agencies to comply with and
        implement all of the reasonable and prudent alternative (RPA)
        mitigation actions described in the 2000BiOp, with the exception of
        certain specific 2005 summer flow and spill measures NWF seeks
        to have implemented.

3.      As to 2005 summer flow, an order requiring the action agencies to:

(a)     Decrease by at least 10 percent the water particle travel time (WPTT) in
        the Snake River from the head of Lower Granite reservoir to Ice Harbor
        Dam between June 20, 2005 and August 31, 2005, with the decrease
        distributed evenly during this period, over what the WPTT would be under
        the proposed action, the 2004BiOp, and the agencies' estimate of average
        Snake River flows in July and August this summer of approximately
        27,750 cubic feet per second (cfs) (which includes an estimated 300,000
        acre feet of total flow augmentation water from the Upper Snake River and
        237,000 acre feet of water from Brownlee), through an appropriate
        combination of reservoir drawdown, additional flow augmentation, and
        other measures that would provide the most favorable migration
        conditions for listed species; and

(b)     Decrease by at least 10 percent the WPTT in the Columbia River from its
        confluence with the Snake River to Bonneville Dam between July 1, 2005
        and August 31, 2005, with the decrease distributed evenly during this
        period, over what the WPTT would be under the proposed action,
        2004BiOp, and the agencies' estimate of average Columbia River flows in
        July and August this summer of approximately 137,250 cfs, through an
        appropriate combination of reservoir drawdown, additional flow
        augmentation, and other measures that would provide the most favorable
        migration conditions for listed species.

4.      As to 2005 summer spill, an order requiring the action agencies to:

(a)     Provide spill from June 20, 2005, through August 31, 2005, of all water in
        excess of that required for station service, on a 24-hour basis, at the

Lower Granite, Little Goose, Lower Monumental, and Ice Harbor Dams on the lower Snake River; and

(b)     Provide spill from July 1, 2005, through August 31, 2005, of all flows above 50,000 cfs, on a 24-hour basis, at the McNary Dam on the Columbia River.

5.      An order requiring the Corps, BOR, and NOAA to file with the court a joint report on spill and flow requirements within 10 days of the entry of an injunction, setting forth the operational measures they will employ to comply with the terms of the injunction and, thereafter, to file reports every two weeks, beginning two weeks after June 20, 2005, until two weeks after August 31, 2005, demonstrating compliance with these terms.

## **Injunction Standards**

When federal statutes are violated, a party is entitled to an injunction when one is "necessary to effectuate the congressional purpose behind the statute." *Biodiversity Legal Foundation v. Badgley*, 284 F.3d 1046, 1057 (9th Cir. 2002).

Under the ESA, once a plaintiff has succeeded on the merits, injunctive relief depends on a balance of the harm to the listed species and the public interest.  *National Wildlife Fed. v. NMFS*, 235 F.Supp.2d 1143, 1161 (W.D. Wa. 2002).   A plaintiff is required to show only a "possibility" of irreparable harm to the listed species to obtain an injunction under the ESA.  *Earth Island Inst. v. U.S. Forest Service*, 351 F.3d 1291, 1298 (9th Cir. 2003).

## **Discussion**

**A.     Injunction Against NOAA**.

In my May 2005 opinion, I found the 2004BiOp does not comply with the ESA's mandate to protect listed species.  I deny NWF's motion to require NOAA to withdraw the 2004BiOp.  Rather, I set a status conference for 9:00 a.m. on September 7, 2005, to

discuss the remand, the possible withdrawal of the 2004BiOp, and what, if anything, shall remain in place during the remand.  In the interim, I encourage the parties to attempt to reach a consensus on these issues, as well as issues relating to the timeframe for the remand and the instructions and reporting requirements that will guide the remand.  The parties shall advise me if a consensus is reached.

**B.     Injunction Against Action Agencies.**

  **1.     Violation of the ESA.**

In my May 2005 opinion, I found the 2004BiOp violates the ESA.  I now conclude that, in light of their reliance on the 2004BiOp, the Record of Consultation and Statement of Decision (ROD) issued by the Corps on January 3, 2005, and the ROD issued by the BOR on January 12, 2005, also violate the ESA.

Federal defendants maintain that the RODs go beyond mere reliance on the BiOp to offer an independent rational account for the agencies' decisions.  I disagree. The RODs provide no specific analysis nor point to any record evidence to support the assertion that the action agencies conducted independent assessments and reached independent and rational conclusions in adopting them.  The RODS reveal that these agencies embraced the same fundamental legal flaws that NOAA attempted to use to justify its  circumscription of the action subjected to jeopardy analysis.  I find, therefore, that in substance the RODs relied on the no-jeopardy finding of the 2004BiOp without an independent rational basis for doing so.

Federal defendants, citing *Pyramid Lake Paiute Tribe v. U.S. Dept. of Navy*, 989 F.2d 1410, 1415 (9th Cir. 1990), maintain that the Corps and BOR were entitled to rely

on the 2004BiOp, even if invalid, unless the agencies had "new information" that was not before NOAA when it issued the 2004BiOp.   I disagree.   While "new information" forms one basis for finding that an action agency may not rely on a no-jeopardy finding in a biological opinion, this is not the only basis.  *Pyramid Lake* notes a second consideration, finding that "the record contain[ed] no other data which undermine[d] seriously the FWS's opinions."  *Id.* at 1416.   This court has previously found that an action agency cannot rely on a "facially arbitrary no-jeopardy determination" where extensive record evidence indicates an action will harm threatened species.  *Northwest Environmental Advocates v. EPA*, 268 F.Supp.2d 1255, 1274 (D. Or. 2003).

I find that there was substantial "other data" reported in the 2004BiOp itself, including the level of morality attributable to so-called nondiscretionary elements of the proposed action.   That consideration of the data, however, was consigned to the "environmental baseline" and thereby not utilized to form the basis of the required jeopardy analysis and adverse modification determinations.   The action agencies knew of this other data, and of its marginalization by NOAA, and yet adopted NOAA's no-jeopardy determination.   I find, therefore, that the agencies have failed in their continuing independent duties to ensure that their actions will avoid jeopardy.   The action agencies were not entitled to base their determination as to the impact of their proposed action on any analysis that excludes full consideration of all its elements.

I conclude that the determinations by the Corps and BOR that the proposed action will not likely jeopardize listed species are arbitrary and capricious and violate the ESA.

## 2.    <u>Harm to Listed Species.</u>

In my May 2005 opinion, I ruled that adverse impacts to listed species cannot be insulated from the basis of NOAA's jeopardy analysis simply because they are deemed to be attributable to the existence and non-discretionary operations of the dams.  As currently operated, I find that the DAMS strongly contribute to the endangerment of the listed species and irreparable injury will result if changes are not made.

As noted above, the 2004 BiOp is substantially procedurally flawed because it failed to conduct a jeopardy analysis on the basis of all elements of the proposed action, including so-called nondiscretionary aspects of the operation of the DAMS.  Where "a project is allowed to proceed without substantial compliance" with the procedural requirements of the ESA, "there can be no assurance that a violation of the ESA's substantive provisions will not result."  *Thomas v Peterson*, 753 F.2d 754, 764 (9th Cir.1985).

Ample evidence in the record, some of which was cited by NWF (Pl. Reply Memo. at 36-37), indicates that operation of the DAMS causes a substantial level of mortality to migrating juvenile salmon and steelhead.  Indeed, in the 2004BiOp itself, NOAA noted that while "a non-trivial level of mortality would likely occur even under free-flowing river conditions . . ., the existence and operations of the dams and reservoirs . . . account[s] for most of the mortality of juvenile migration through the FCRPS . . . ."  2004BiOp at 5-29.

As a hedge against a portion of the mortality attributable to DAM operations, the RPA for the 2000 BiOp targeted spill during summer months at a level minimally

necessary to allow for a meaningful in-river migration program against which the summer transportation program would be compared. However, the proposed action analyzed in the 2004BiOp allows for no voluntary spill at four lower Snake River and Columbia Dams (Lower Granite, Little Goose, Lower Monumental, and McNary) during the summer transport period. This restriction would not preserve even a semblance of the spread-the-risk considerations NOAA contends govern the spring migration program. It would not allow a meaningful evaluation of the summer transportation program.

I find that irreparable harm results to listed species as a result of the action agencies' implementation of the updated proposed action. The law is clear that an injunction to protect listed species from harm is necessary regardless of economic costs. *National Wildlife Fed. v. NMFS*, 235 F.Supp.2d at 1161; *Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir. 1987). I have found that NOAA's attempt to insulate the lion's share of impacts attributable to ongoing operation of the DAMS from jeopardy scrutiny is invalid. I also find that if the action agencies carry out the proposed action, they will not have met their key substantive obligation under the ESA to "insure that any action" they carry out "is not likely to jeopardize" or adversely affect the critical habitat of listed species, 16 USC § 1536(a)(2). This is because the proposed action is not supported by an adequate consultation and a no-jeopardy determination.

Although I intend to order the action agencies to withdraw their RODs implementing the proposed action, I reserve my final order until after the September 7th status conference on the remand issues.

3.    **Implementation of 2000 RPA.**

I reserve my final order on this issue until after the September 7th status conference on the remand issues.

4.    **2005 Summer Operations.**

(a)    **Increased Rates of Flow**.

Although NWF has strongly argued that a change in WPTT is necessary to avoid irreparable harm to juvenile fall chinook this summer, I am convinced that accomplishment of this goal requires further study and consultation.  I deny NWF's request as to the 2005 summer flow, subject to the requirement that during the remand, the parties and their representatives shall engage in a collaboration to resolve the issues raised by flow.  I will issue specific instructions with respect to the flow collaboration.

(b)    **Spill.**

I grant NWF's motion with respect to 2005 summer spill.  This injunction is necessary to avoid irreparable harm to juvenile fall chinook and other listed species. The action agencies shall:

(1)   Provide spill from June 20, 2005, through August 31, 2005, of all water in excess of that required for station service, on a 24-hour basis, at the Lower Granite, Little Goose, Lower Monumental, and Ice Harbor Dams on the lower Snake River; and

(2) Provide spill from July 1, 2005, through August 31, 2005, of all flows above 50,000 cfs, on a 24-hour basis, at the McNary Dam on the Columbia River.

I encourage the parties to engage in discussions to reach a consensus on issues of spill, and to advise me if one is reached during the period covered by my 2005 summer spill order.  Otherwise, the spill shall proceed in accordance with this order.

## CONCLUSION

In accordance with the foregoing discussion, the court **GRANTS in part and DENIES in part**  NWF's motion for a preliminary injunction or, in the alternative, for a permanent injunction (doc. 834).  I reserve decision on whether NWF must post an injunction bond until after further briefing by the parties.

IT IS SO ORDERED.

DATED this 10th day of June, 2005.


 /S/ James A. Redden_____
James A. Redden
 United States District Judge